**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2454-22

STATE OF NEW JERSEY,

     Plaintiff-Respondent,

v.

LAQUAN A. MCCALL,

     Defendant-Appellant.

_____

Submitted December 3, 2024 – Decided March 18, 2025

Before Judges Firko and Augostini.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Indictment No. 19-11-0722.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Kevin S. Finckenauer, Assistant Deputy Public Defender, of counsel and on the briefs).

William A. Daniel, Union County Prosecutor, attorney for respondent (Michele C. Buckley, Assistant Prosecutor, of counsel and on the brief).

PER CURIAM

A jury convicted defendant Laquan A. McCall of the lesser included offense of second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1), arising out of the killing of Oscar Melara after he was repeatedly punched in the face. On these convictions, defendant was sentenced as a persistent offender pursuant to N.J.S.A. 2C:44-3(a) to an aggregate extended prison term of sixteen years, subject to the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2. The trial court merged the aggravated assault conviction into the reckless manslaughter conviction.

Defendant appeals from his convictions and sentence, arguing the trial court erred in: (1) admitting the witness, Kevin Harvey's prior statements to the police without first conducting a Gross[1] hearing; (2) failing to follow the procedure under State v. Burr[2] and its progeny in replaying the prerecorded

---

[1] "[A] Gross hearing is the name given to the Rule 104 hearing that the trial court conducts to determine the admissibility of a witness's inconsistent out-of-court statement – offered by the party calling that witness – by assessing whether the statement is admissible." State v. Greene, 242 N.J. 530, 540 n.2 (2020) (citing State v. Gross (Gross I), 121 N.J. 1, 15-17 (1990); State v. Cabbell, 207 N.J. 311, 322 n.5 (2011)).

[2] 195 N.J. 119 (2008) (holding that if a request is made by a jury to replay a videotaped pretrial interview introduced into evidence, the court must take precautions under State v. Michaels, 264 N.J. Super. 579 (App. Div. 1993), to

police interviews of Harvey and Shakeena Tanner for the jury during deliberations; (3) failing to follow the procedure outlined in State v. Muhammad[3] with regard to the prosecutor's reliance on Harvey and Tanner's videotaped statements during summation; (4) leaving out a portion of the reckless manslaughter model charge that explains an essential element of the offense to the jury; and (5) considering the applicable sentencing range after granting a motion for a discretionary extended term, rejecting the provocation mitigating factor, and failing to vacate the duplicative aggravated assault conviction. Defendant also argues that the United States Supreme Court's decision in Erlinger v. United States, 602 U.S. 821 (2024), warrants vacatur of defendant's sentence because the facts underlying the persistent offender extended term were not presented to a grand jury nor found by the petit jury.

On August 26, 2024, we granted defendant's motion to file a supplemental brief based on the Supreme Court decision in Erlinger. On December 19, 2024, we issued our decision in State v. Carlton, 480 N.J. Super. 311 (App. Div. 2024),

---

reduce any prejudicial impact, including asking if the jurors could have their needs met through an impartial readback of transcribed testimony).

[3] 359 N.J. Super. 361, 380 (App. Div. 2003) (holding that an attorney who intends to play portions of videotaped trial during summation should "inform the court and all other counsel at the earliest possible time").

addressing the retroactive application of the U.S. Supreme Court's decision in Erlinger.  In Carlton, we held that in those cases, where a defendant has been found eligible for sentencing as a persistent offender pursuant to N.J.S.A. 2C:44-3(a) by a judge and not a jury, that defendant is eligible for resentencing only after a jury has determined whether he [or she] meets the persistent offender criteria.  Id. at 355.

As a result of our decision in Carlton, the State submitted a letter dated January 21, 2025, agreeing that defendant's extended term sentence should be vacated and his case remanded to a trial court for a jury to determine whether he meets the criterion of a persistent offender as set forth in N.J.S.A. 2C:44-3(a).

Having reviewed the record and law, we affirm defendant's convictions but vacate his extended term sentence.  We remand for further proceedings in accordance with Erlinger and Carlton to have a jury determine whether defendant is eligible for enhanced punishment as a persistent offender.  602 U.S. at 821; 480 N.J. Super. at 355.

I.

Defendant's convictions arose out of an incident occurring in the early morning hours of July 27, 2019, outside Ben's Bar in Elizabeth.  On July 26, 2019, several individuals, Shakeena Tanner, Kevin Harvey, Yamerah "Mara"

Davis, an individual known as "Pop," and the victim, Oscar Melara, went to the bar in the evening. At some point, Harvey and Davis left the bar and went outside to smoke. Tanner, Pop and Melara remained in the bar. While outside, Harvey received a call from Tanner to come and get Melara, who was highly intoxicated and causing problems at the bar. Harvey explained they were going to take Melara home.

After Melara came outside, Harvey put him in the car. The others eventually came outside and were talking near the car about taking Melara home. While outside in the parking lot, another individual, co-defendant Christopher Elliot, known as Tenna, approached Melara. Harvey testified that, after speaking to Melara, Elliot left the area and drove away in a black Dodge Charger.

Shortly thereafter, Elliot returned with another individual identified by Harvey as "Quan" who is defendant. According to Harvey, when Elliot returned with defendant, "we tried to tell [defendant] to stop and chill . . . ." Tanner walked up to defendant and Elliot and told them everything was fine, but Harvey testified that things then escalated. Harvey testified that defendant then punched Melara, who tried to run away from defendant.

A-2454-22

Emergency medical personnel were called and arrived on the scene. Melara was unconscious and not breathing. It was later determined he suffered a brain hemorrhage, which caused brain swelling and brain herniation due to blunt impact, causing his death.

During the ensuing investigation, police interviewed many potential witnesses and took recorded statements from Harvey and Tanner.[4] Specifically, the police obtained two videotaped statements from Harvey, which differed in some respects from his testimony at trial. In his recorded statement, Harvey told the police that defendant hit Melara four times, including once after he fell to the ground. However, during his trial testimony, Harvey had difficulty recalling information and initially stated defendant did not hit Melara four times.

On July 27, 2019, the police also obtained a videotaped statement from Tanner, wherein she stated that Elliot left the bar, returned with defendant, and she witnessed defendant hit Melara twice. During her trial testimony, Tanner recanted her prior statement and denied that defendant and Elliot had anything to do with the incident.

---

[4] The record does not include the actual videotaped recordings of the interviews or the transcripts of those interviews, only portions of which were played for the jury. However, the portions of the interviews played during trial were transcribed verbatim into the record.

6

The police also recovered video surveillance footage of the parking lot from a nearby apartment complex. This footage showed two men entering a black car and driving off around the time of the incident. Law enforcement learned that co-defendant Elliot owned the make and model of the car described by the witnesses.

On November 15, 2019, a Union County grand jury returned an indictment charging defendant with first-degree aggravated manslaughter, in violation of N.J.S.A. 2C:11-4(a)(1) (count one), and second-degree aggravated assault in violation of N.J.S.A. 2C:12-1(b)(1) (count two). Co-defendant Elliot was also charged for count two with second-degree aggravated assault.

On November 2, 2022, the jury trial started and was conducted over several days. At trial, the State presented testimony from several witnesses, including Harvey and Tanner, medical experts and law enforcement involved with the investigation.

At trial, Harvey and Tanner gave testimony that differed from the statements they gave to the police shortly after the incident. Harvey, for instance, denied having stated it was four times, when asked on direct examination if defendant hit Melara four times. However, after being confronted with the statement he gave to law enforcement following the

7

incident, Harvey testified that "[i]f it says four times, then, okay, four times." Based on Harvey's unwillingness to answer questions, the court permitted the State to treat Harvey as a hostile witness pursuant to N.J.R.E. 611.[5]

During his direct testimony, Harvey continued to give inconsistent answers and claimed to be unable to remember specific details. Before the State confronted Harvey with portions of his recorded statements, Harvey was excused for the day. However, before Harvey resumed his testimony, the court conducted a Rule 104 hearing.[6]

At the hearing, Sergeant Lamar Hartsfield, who took statements from Harvey and Tanner, identified Harvey's statements taken on July 27, and July 31, 2019, and verified that no changes or alterations were made to either statement. Defendant's counsel was given an opportunity for cross examination, and both statements were admitted into evidence.

---

[5] N.J.R.E. 611(c), which generally prohibits leading questions on direct, permits leading questions, "[w]hen a party calls an adverse party or a witness identified with an adverse party, or when a witness demonstrates hostility or unresponsiveness . . . subject to the discretion of the court."

[6] A "104 hearing" is a hearing pursuant to N.J.R.E. 104 to address "preliminary evidence questions that are the exclusive province of the court," outside the presence of the jury, which may include witness qualifications, admissibility of evidence, such as the statements of a defendant in a criminal trial. Biunno, Weissbard & Zegas, Current N.J. Rules of Evidence, cmt. 1 on N.J.R.E. 104 (2025).

The next day, November 3, 2019, the State resumed Harvey's direct examination. The State confronted Harvey with portions of his recorded statement during his testimony without objection. At one point during direct, the court limited the use of prior recorded statements to address only Harvey's denial of prior statements.

Tanner was also called to testify on behalf of the State. During her testimony, Tanner recanted prior statements made in her recorded statements. For instance, during her testimony, Tanner denied seeing anyone hit Melara. However, in the statement she gave to law enforcement after the incident, Tanner stated that she saw an individual known to her as "True Eyes," later identified as defendant, hit Melara twice.

At trial, she testified that, she saw an individual approach Melara inside the bar but had not seen that individual earlier in the night. Tanner denied that this individual approached her outside in the parking lot as well. She testified further that she did not recall anyone approaching the group outside. Tanner acknowledged seeing Melara fall to the ground but claimed not to have seen the altercation. She testified she responded by going to Melara and rolling him over.

In contrast, Tanner said in her videotaped statement that she saw individuals get out of a black car in the parking lot. Tanner recanted her prior

statement on the stand and testified she never saw anyone get out of the black car. Tanner denied being familiar with defendants or that she had provided detectives with nicknames, descriptions, and the individuals' addresses who had gotten into the altercation with Melara.

Because Tanner recanted prior statements made to law enforcement, the court excused the jury and conducted a Gross hearing on Tanner's prior videotaped statement. Lieutenant Johnny Ho, who conducted Tanner's interview on July 27, 2019, testified during the hearing. Following Lieutenant Ho's testimony, the court analyzed the Gross factors and found Tanner's statement reliable and therefore admissible. Tanner's statement was then played for the jury. At the conclusion of the videotaped statement, the court instructed the jury on the proper consideration of a witness' prior inconsistent statement. Because the court had not given this instruction at the time Harvey's statement was shown, the court instructed the jury that this same instruction applied to Harvey's statement.

Davis testified that she did not witness the fight or see who struck Melara. She testified that she saw Melara run. Subsequently, she saw him lying on the ground. Davis called 911 and described Melara's attackers as wearing all black but did not see their faces, nor identify either individual.

10

Defendant elected not to testify and called no witnesses. On November 15, 2022, the parties delivered summations. During the State's summations, portions of both Harvey's and Tanner's recorded statements were played for the jury.

Before charging the jury, the court conducted a charge conference with the parties, and no objections were made to the proposed jury instructions. Following summations, the court charged the jury. In relevant part, the court instructed the jury on how to consider Harvey's and Tanner's inconsistent testimony and on the elements of the offenses, including the lesser included offense of reckless manslaughter, which the State was required to prove beyond a reasonable doubt.

The jury deliberated for several days after hearing all the evidence. On November 16, 2022, the jury requested to view the body camera footage from Ben's Bar, the video compilation of surveillance cameras footage, and Harvey and Tanner's videotaped statements. The evidence was played in open court for the jury.

On November 17, 2022, the jury requested a read back of both expert witnesses' testimony. On November 18, 2022, the jury requested to rewatch Harvey's and Tanner's videotaped statements and the body camera footage. The

11

evidence again was replayed for the jury in open court. Approximately thirty minutes later, the jury returned a verdict of guilty on second-degree reckless manslaughter, N.J.S.A. 2C:11-4(b)(1), as a lesser included offense of aggravated manslaughter, and second-degree aggravated assault, N.J.S.A. 2C:12-1(b)(1).

On March 10, 2023, defendant appeared for sentencing. At sentencing, the trial court considered the State's application to sentence defendant as a persistent offender, N.J.S.A. 2C:44-3(a), and reviewed the criteria under the statute. Having found that all criteria were satisfied, the trial court imposed a sixteen-year prison term with a period of parole ineligibility and supervision as prescribed by NERA. The court merged the conviction for aggravated assault with the conviction for reckless manslaughter. Defendant appeals from his convictions and sentence.

## II.

On appeal, defendant presents five arguments, stated as follows, for our consideration:

> POINT I – THE TRIAL COURT ERRED IN ADMITTING AS EVIDENCE KEVIN HARVEY'S PRIOR STATEMENTS TO THE POLICE— STATEMENTS DIRECTLY INCRIMINATING [DEFENDANT] THAT WERE PLAYED FOR THE JURY A TOTAL OF FOUR TIMES—WITHOUT FIRST CONDUCTING A MANDATORY GROSS HEARING. (Not raised below).

A-2454-22

POINT II – THE TRIAL COURT FAILED TO FOLLOW THE PROPER PROCEDURE UNDER STATE V. BURR AND ITS PROGENY IN REPLAYING THE PRERECORDED POLICE INTERVIEWS OF KEVIN HARVEY AND SHAKEENA TANNER FOR THE JURY DURING ITS DELIBERATIONS. (Not raised below).

POINT III – THE PROCEDURE OUTLINED IN STATE V. MUHAMMAD WAS NOT FOLLOWED WITH RESPECT TO THE PROSECUTOR'S SUBSTANTIAL RELIANCE ON MR. HARVEY'S AND MS. TANNER'S VIDEOTAPED STATEMENTS DURING SUMMATION. (Not raised below).

POINT IV – THE TRIAL COURT ERRONEOUSLY LEFT OUT A CRITICAL PORTION OF THE RECKLESS MANSLAUGHTER MODEL CHARGE THAT EXPLAINS AN ESSENTIAL ELEMENT TO THE JURY. (Not raised below).

POINT V – THE TRIAL COURT ERRED IN CONSIDERING WHAT THE APPLICABLE SENTENCING RANGE WAS AFTER GRANTING A MOTION FOR A DISCRETIONARY EXTENDED TERM, ERRED IN REJECTING THE PROVOCATION MITIGATING FACTOR, AND ERRED IN FAILING TO VACATE THE DUPLICATIVE AGGRAVATED ASSAULT CONVICTION.

In a supplemental filing, defendant raises the following argument:

THE UNITED STATES SUPREME COURT IN ERLINGER V. UNITED STATES HELD THAT ANY FACTS ENHANCING A DEFENDANT'S SENTENCE MUST BE PRESENTED TO A GRAND JURY AND FOUND BY A PETIT JURY. BECAUSE

13

THE FACTS UNDERLYING THE PERSISTENT-OFFENDER EXTENDED TERM APPLIED TO [DEFENDANT] WERE NOT INDICTED OR FOUND BY THE TRIAL JURY, HIS EXTENDED-TERM SENTENCE MUST BE VACATED AND A TERM WITHIN THE ORDINARY RANGE IMPOSED. (Not raised below).

A. Trial Errors

We begin by considering defendant's arguments pertaining to the admissibility and replaying of Harvey's and Tanner's prerecorded police interviews raised for the first time on appeal. We review arguments raised for the first time on appeal under a plain error standard, meaning "we disregard [such] error[s] unless [they are] 'clearly capable of producing an unjust result.'" State v. Daniels, 182 N.J. 80, 95 (2004) (citing R. 2:10-2). We deal with claims of error not raised at trial differently from those timely challenged because "[i]t may be fair to infer from the failure to object below that in the context of the trial the error was actually of no moment." State v. Macon, 57 N.J. 325, 333 (1971). We will reverse only if we are convinced the error was "'sufficient to raise a reasonable doubt as to whether [it] led the jury to a result it otherwise might not have reached.'" State v. Ahmad, 246 N.J. 592, 612 (2021) (alteration in original) (quoting Daniels, 182 N.J. at 95; Macon, 57 N.J. at 336).

A-2454-22

We also note that evidentiary rulings of the trial court are entitled to deference, and we review such decisions on appeal for an abuse of discretion. State v. Singh, 245 N.J 1, 12-13 (2021) (citing State v. Nantambu, 221 NJ. 390, 402 (2015)).  We do not substitute our judgment for that of the trial court.  Id. at 13 (citing State v. Brown, 17 N.J. 138, 147 (2001)).  Rather, evidentiary rulings "are subject to limited appellate scrutiny."  Ibid. (quoting State v. Buda, 195 N.J. 278, 294 (2008)).

1. Admission of Harvey's Recorded Statement Without Conducting a Gross Hearing.

Defendant contends that the court's failure to conduct a hearing before admitting Harvey's videotaped statement amounts to plain error, warranting a reversal and remand for a new trial.  The State counters that the court heard sufficient testimony to find the statements reliable and trustworthy, thus admissible pursuant to Gross I.  121 N.J. at 1.  Evaluating this alleged error under plain error review, we discern no abuse of discretion in the court's decision to admit Harvey's and Tanner's prior inconsistent statements under these circumstances.

N.J.R.E. 803(a)(1) permits the admission of a declarant-witness's prior inconsistent statement as substantive evidence as an exception to the hearsay rule.  "[E]xceptions to the hearsay rule 'are justified primarily because the

15

circumstances under which the statements are made provide strong indicia of reliability.'" State v. Savage, 172 N.J. 374, 402 (2002). N.J.R.E. 803(a)(1) provides the parameters for the admissibility of the prior inconsistent statement so long as "[t]he declarant-witness testifies and is subject to cross-examination about a prior otherwise admissible statement, and the statement:

> (1) is inconsistent with the declarant-witness' testimony at the trial or hearing and is offered in compliance with Rule 613.
>
> However, when the statement is offered by the party calling the declarant-witness, it is admissible only if, in addition to the foregoing requirements, it (A) is contained in a sound recording or in a writing made or signed by the declarant-witness in circumstances establishing its reliability or (B) was given under oath at a trial or other judicial, quasi-judicial, legislative, administrative or grand jury proceeding, or in a deposition . . . ."
>
> [N.J.R.E. 803(a)(1).]

This Rule "is designed 'to limit substantive admissibility of prior inconsistent statements [of the proponent's witness] to those statements given in a form and under circumstances importing special reliability.'" Gross I, 121 N.J. at 9 (quoting State v. Gross, 216 N.J. Super. 98, 107 (App. Div. 1987)).

Our Supreme Court in Gross I held that "[t]he Rule requires, when the statement is offered by the party calling the witness, both the opportunity to

16

cross-examine and sufficient indicia of antecedent reliability." Id. at 15. The Court further held that a trial court should conduct a hearing "to determine the reliability of [the witness's] prior inconsistent statement as a basis for admission . . . ." Id. at 17.

If the court is satisfied the prior statement is inconsistent, it must then determine whether the prior recorded or written statement was given "in circumstances establishing its reliability." N.J.R.E. 803(a)(1). The court must "determine from the proofs whether the prior statement was made or signed under circumstances establishing sufficient reliability that the factfinder may fairly consider it as substantive evidence." Gross, 216 N.J. Super. at 110. The trial court must consider "[a]ll of the relevant circumstances" that may impact reliability of a statement, which may include:

> (1) the declarant's connection to and interest in the matter reported in the out-of-court statement, (2) the person or persons to whom the statement was given, (3) the place and occasion for giving the statement, (4) whether the declarant was then in custody or otherwise the target of investigation, (5) the physical and mental condition of the declarant at the time, (6) the presence or absence of other persons, (7) whether the declarant incriminated himself or sought to exculpate himself by his statement, (8) the extent to which the writing is in the declarant's hand, (9) the presence or absence, and the nature of, any interrogation, (10) whether the offered sound recording or writing

contains the entirety, or only a portion or a summary, of the communication, (11) the presence or absence of any motive to fabricate, (12) the presence or absence of any express or implicit pressures, inducements or coercion for the making of the statement, (13) whether the anticipated use of the statement was apparent or made known to the declarant, (14) the inherent believability or lack of believability of the statement and (15) the presence or absence of corroborating evidence.

[Id. at 109-10.]

Here, the parties acknowledged that Harvey provided inconsistent testimony and repeatedly denied knowing or recalling many of the details of the incident that occurred outside of Ben's Bar. Because Harvey repeatedly failed to recall the events of that evening or was unresponsive to the State's questions, the court granted the State's request to treat Harvey as a hostile witness and permitted leading questions on direct.

When asked whether defendant hit Melara four times, Harvey feigned not recalling telling the police in his recorded statement that defendant hit Melara four times. Harvey was then shown his prior statement to refresh his recollection, at which time he testified, "it was not four times." The following exchange occurred:

> [PROSECUTOR]: So July 27th, 2019, you told the detectives at the Union County Prosecutor's Office that [defendant] hit [Melara] four times?

[HARVEY]: No, ma'am. When I'm up here, it's a big blur to me because a lot of stuff is -- I'm kind of refreshing it. A lot of this is new. A lot of this stuff -- I don't really recall saying half of this stuff that's up here, most of this stuff. I'm confused. I don't remember me saying "four times," ma'am. I'm seeing a lot of typos. This is blurred out. A lot of this stuff.

Before permitting the State to confront Harvey with his recorded video statement and showing portions of it before the jury, the court excused the witness and the jury and conducted a Rule 104 hearing.

Sergeant Hartsfield, who took Harvey's statements, testified at the hearing. Sergeant Hartsfield identified Harvey's statements on July 27 and July 31, 2019, and confirmed that no deletions or alterations were made to either statement. Defendant's counsel was given an opportunity to cross-examine Sergeant Hartsfield but did not ask any questions. Defendant's counsel did not challenge the reliability of either the July 27 or July 31, 2019, statement nor object to their admissibility during the hearing.

The following day, November 3, 2022, before portions of Harvey's recorded statement were played before the jury, the court inquired of defense counsel as to whether they reviewed the recorded statement to "make sure that whatever is played to the jury [was] not prejudicial to the defendants." The State then represented to the court:

19

[PROSECUTOR]: . . . After Your Honor found reliability of the statements through the 104 [hearing], we did[—]all parties did meet and agree on what portions should not come in, and we did last night clip the portions that the State would be using today, and provided a transcript, highlighted, to both defense counsel[.]

Defendant's counsel concurred with the State's representation and did not raise any objections.

The State resumed its questioning of Harvey and played portions of his prior statement at times when he was either evasive or provided contradictory testimony. During the State's questioning, the court limited use of Harvey's prior statements only to the times he denied certain statements.

Harvey agreed that he had previously made those statements to law enforcement. Harvey also acknowledged that he had not been threatened when giving his statement, and no one told him what to say. While Harvey testified that he had been told that Melara was alive, he acknowledged that had he known the truth, his statement would not have changed. Finally, when asked about the truthfulness of his statement, the following exchange took place:

[PROSECUTOR]: And at the end of the statement they asked you if you were[—]they asked you if you swore that everything you told in that statement was the truth, right?

[HARVEY]: Yeah.

20

[PROSECUTOR]: And you said it was, correct?

[HARVEY]: Yeah. Everything, yes.

While the court did not make specific findings pursuant to Gross I, it permitted limited use of Harvey's prior recorded statements to those areas where Harvey's testimony was inconsistent with his prior recorded statement. Harvey was also subjected to cross-examination regarding his recollection of the incident. Additionally, during the trial, the court instructed the jury related to Tanner's and Harvey's prior inconsistent statements and repeated those instructions during the final jury instructions.

Having analyzed the record, the court's admission of portions of Harvey's previously recorded statement without making more specific findings under Gross I does not amount to plain error under these circumstances. Rather, the substantial, credible evidence in the record demonstrates sufficient reliability of Harvey's prior recorded statement, and the court properly admitted limited portions into evidence based on Harvey's inconsistent testimony.

2. Failure To Follow Procedure Under Burr in Replaying Prerecorded Police Interviews of Harvey and Tanner.

Defendant next contends the trial court erred by replaying Harvey's and Tanner's recorded video statements during the jury's deliberations without following the procedures set forth in Burr, 195 N.J. at 134-35. The State

21

counters that no plain error occurred because only brief portions of the video recorded statements were played for the jury and during the first request, the jury heard the readback of Harvey's and Tanner's entire trial testimony, which put the recordings in proper context. Moreover, defendant did not object, nor did he request any special instructions. Based upon a review of the record, we discern no plain error in the trial court's decision to allow the playbacks under these circumstances.

A trial court's decision to replay a recording of a videotaped statement admitted into evidence for a deliberating jury is within the sound discretion of the trial judge. State v. A.R., 213 N.J. 542, 559 (2013). "Generally, once an exhibit has been admitted into evidence, the jury may access it during deliberations, subject to the court's instructions on its proper use." Burr, 195 N.J. at 133-34 (citing R. 1:8-8; Fiorino v. Sears Roebuck & Co., 309 N.J. Super. 556, 567-69 (App. Div. 1998)).

We recognize that our Supreme Court has established "precautionary procedures" when such requests made during jury deliberations are for a replay of a recorded video statement because of the dangers inherent to replaying a recorded video statement. Id. at 134. When faced with a playback request from a deliberating jury, "trial judges [] retain discretionary authority to try to narrow

a jury's request if it calls for the playback of extensive testimony." State v. Miller, 205 N.J. 109, 122-23 (2011).

Here, on November 16, 2019, the jury sent a note with several requests to review, in relevant part, the segments of the July 27, 2019, interviews of Harvey and Tanner, transcripts of their interviews, and transcripts of Harvey's and Tanner's trial testimony. Because the transcripts of Harvey's and Tanner's interviews were not admitted into evidence, the court did not permit the jury to have copies or a readback of the interviews. The jury was permitted to hear a readback of both witnesses' trial testimony, and were allowed to view, in open court, the portions of the witnesses' recorded statements that were previously admitted into evidence.

Later during deliberations, the jury again requested to view the portions of Harvey's and Tanner's recorded video statements that were admitted into evidence. The second replaying occurred without a readback of the witnesses' testimony. Again, defendant did not object.

Because defendant did not object to either playback of Harvey's or Tanner's recorded video statements, we analyze any errors pursuant to plain error standard and evaluate it against "the overall strength of the State's case." State v. Weston, 222 N.J. 277, 295 (2015) (quoting State v. Nero, 195 N.J. 397,

407 (2008)) (internal quotation marks omitted). Not only did defendant not object to either request for playbacks of the recorded statements, but during summations, defendant's counsel referred to the inconsistencies between Harvey's and Tanner's trial testimony and their prior recorded statements, arguing Harvey felt pressured to "say something" to law enforcement and that they were too intoxicated to recall details of the incident.

While the court did not inquire of the jury at either time if the readback of the witnesses' testimony alone would suffice, the earlier playback occurred in the context of a readback of both witnesses' trial testimony. Further, we recognize that the second playback of the limited portions of the witnesses' prior recorded statements to law enforcement was not given along with a readback of testimony, nor did the court give a limiting instruction at the time of the playbacks. However, in the final instructions, the court instructed the jury regarding the proper use and consideration of a witness' prior inconsistent statement and that the jury must ultimately decide if the statement is reliable.

Thus, in considering the alleged errors in light of the strength of the State's case and the jury's verdict, acquitting defendant of aggravated manslaughter and convicting him on the lesser included offense of reckless manslaughter and aggravated assault, we are satisfied that the jury considered the totality of the

24

evidence presented, and these errors did not meet the high bar of plain error by being "clearly capable of producing an unjust result[.]" R. 2:10-2.

### 3. Failure To Follow Procedures in Muhammad as to Prosecutor's Use of Harvey's and Tanner's Videotaped Statements During Summation.

Defendant contends that the prosecutor's failure to give ample notice of her intention to use portions of the witnesses' videotaped statements during summation resulted in further error because the court was unable to hold the appropriate hearing on the issue and give specific limiting instructions to the jury. Muhammad, 359 N.J. Super. at 379-81. The State contends that the record reveals the prosecutor discussed in advance with defense counsel the "materials she intended to use during closing arguments," and defendant did not object. Again, "guided by the plain error standard," we disregard any alleged error "unless it is 'clearly capable of producing an unjust result.'" Id. at 372 (quoting R. 2:10-2). We are satisfied that, in the context of this case, failing to give notice, conducting a hearing and giving a limiting instruction did not constitute plain error.

"Counsel are traditionally allowed 'broad latitude' in summation." Id. at 378 (quoting Colucci v. Oppenheim, 326 N.J. Super. 166, 177 (App. Div. 1999)). It is not uncommon for counsel to play "[a]udio and videotaped statements of . . . witnesses . . . during summation." Id. at 379. In Muhammad,

we cautioned against showing lengthy video excerpts so "as to constitute a second trial" and editing portions so as to "distort or misstate the evidence." Ibid. We further established safeguards to avoid "potential pitfalls" when counsel elects to use admitted videotaped evidence during summation. Ibid.

First, advance notice of an attorney's intended use of videotaped evidence should be given at the "earliest possible time." Id. at 380. Next, "[a] N.J.R.E. 104(a) type hearing should be conducted in all cases, unless the proponent has identified the excerpts to be played and opposing counsel, with knowledge of those excerpts, expressly waives a hearing with the court's approval." Ibid. Further, the trial court should give a "cautionary instruction, preferably at the time the video is played during summation and again in the final charge." Id. at 382.

There is no dispute that these procedures were not followed in this case. However, the court queried the attorneys before summation if they have had "the opportunity to review the evidence and what [they were] going to be using in [their] summation[s.]" Defendant's counsel advised the court that she had done so, and immediately thereafter, the State advised the court:

> [PROSECUTOR]: . . . And in terms of the State's closing, we do have a PowerPoint presentation that we will show to counsel prior to beginning with our closing, if we could have a few minutes at that point.

A-2454-22

After defense closings, the court took a break to give the State an opportunity to set up their presentation.

Defendant did not object to the State's presentation nor suggest that he was unaware of the evidence the State intended to use during summation. Moreover, defendant did not request a limiting instruction after the State's summation. The State utilized only those excerpts that were admitted into evidence without objection. As we underscored in Muhammad, the trial testimony of both witnesses was played back in its entirety during the jury's deliberations, and "[t]his ameliorated any potential prejudice from the partial playbacks of these witnesses during the prosecutor's summation and from the lack of a limiting instruction." 359 N.J. Super. at 383. Thus, we conclude the use of portions of the witnesses' prior recorded statements, admitted into evidence, did not result in plain error.

B. Jury Instructions

Defendant argues that the court erred in failing to include in the final charge to the jury an essential element of reckless manslaughter, the lesser-included offense for aggravated manslaughter. Defendant concedes that the trial court provided instructions on aggravated and reckless manslaughter that "largely followed the model jury charges." He claims, however, that the court

erred in omitting the explanation as to what "caused" means; namely, by failing to repeat, when giving the reckless manslaughter charge, that the jury must find that the victim would not have died but for defendant's conduct. When reviewing the jury instructions in their entirety, we are satisfied that the jury was properly instructed as to causation.

Again, defendant did not object to the court's jury instructions when delivered and does so now for the first time on appeal. The plain error standard applies and guides our analysis. R. 2:10-2. "[P]lain error requires demonstration of 'legal impropriety in the charge prejudicially affecting the substantial rights of the defendant and sufficiently grievous to justify notice by the reviewing court . . . [and] a clear capacity to bring about an unjust result.'" State v. Chapland, 187 N.J. 275, 289 (2006) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

Proper jury instructions are essential to a defendant's right to a fair trial. State v. Hodde, 181 N.J. 375, 384 (2004) (internal quotations and citations omitted). Recognizing that erroneous jury instructions are generally "poor candidate[s] for rehabilitation," State v. Burns, 192 N.J. 312, 341 (2007) (alteration in original), any alleged error must be "viewed in the totality of the

entire charge, not in isolation," <u>Chapland</u>, 187 N.J. at 289 (citing <u>State v. DiFrisco</u>, 137 N.J. 434, 491 (1994)).

Here, the court instructed the jury on the elements of aggravated manslaughter first and then provided the instruction for reckless manslaughter. The court instructed the jury on the final element the State must prove beyond a reasonable doubt and stated:

> The final element that the State must prove beyond a reasonable doubt is that [] defendant caused Oscar Melara's death. You must find that Oscar Melara would not have died but for [] defendant's conduct.

The court next instructed the jury regarding reckless manslaughter. In doing so, the court repeatedly instructed the jury that the State must prove defendant's conduct caused Melara's death. Specifically, the court stated:

> A person is guilty of reckless manslaughter if he recklessly causes the death of another person. In order for you to find the defendant guilty of reckless manslaughter, the State is required to prove each of the following elements beyond a reasonable doubt. One, that [] defendant acted recklessly, and two, that [] defendant caused . . . Melara's death.

> The first element that the State must prove beyond a reasonable doubt is that [] defendant acted recklessly. A person who causes another's death does so recklessly when he is aware and consciously disregards a substantial and unjustifiable risk that a death will result from his conduct. The risk must be of such a nature and degree considering the nature of the

29

purpose of [] defendant's conduct and the circumstances known to [] defendant, he disregards that [the] risk is a gross deviation from the standard of conduct that a reasonable person will follow in the same situation.

In other words, you must find [] defendant was aware and consciously disregarded the risk of causing death. If you find [] defendant was aware of and disregarded the cause -- of causing death, you must determine whether the risk that he disregarded was substantial and unjustifiable. In so doing, you must consider the nature and the purpose of [] defendant's conduct, the circumstances known to [] defendant, and you must determine whether, in light of those factors, defendant's disregard of that risk was a gross deviation from the conduct a reasonable person would have observed in defendant's situation.

The other element that the State must prove beyond a reasonable doubt is that [] defendant caused Mr. Melara's death.

We are satisfied that viewing this instruction, it is not misleading and "sets forth accurately and fairly the controlling principles of law." State v. Baum, 224 N.J. 147, 159 (2016) (quoting State v. Jackmon, 305 N.J. Super. 274, 299 (App. Div. 1997)). Moreover, in response to the jury's question, the court responded by re-reading the charge on aggravated manslaughter. When doing so, the court repeated the following:

To find the element that the State must prove beyond a reasonable doubt is that [] defendant caused Oscar Melara's death, you must find that Oscar Melara would not have died but for [] defendant's conduct.

Therefore, based upon our review of the entirety of the instructions provided, any alleged error was not "of such a nature as to have been clearly capable of producing an unjust result." Burns, 192 N.J. at 343 (citing R. 2:10-2; Chapland, 187 N.J. at 289).

In sum, we reject defendant's contentions regarding the various alleged trial errors. We discern no plain error in any of these contentions and affirm defendant's convictions.

C.  Sentencing Errors

Following the jury's verdict, defendant was sentenced to an extended term of imprisonment as a persistent offender pursuant to N.J.S.A. 2C:44-3(a).  In sentencing defendant, the court made certain findings that defendant met the criteria set forth in the statute.  Defendant argues that the trial court failed to consider the ordinary term range of sentence as well as the expanded maximum term range after granting the State's motion for an extended term, and further argues that pursuant to the United States Supreme Court's holding in Erlinger, 602 U.S. at 821, the facts underlying the persistent offender extended term must be found by a trial jury and not the court.

The State agrees with defendant that the trial court erred by failing to consider the ordinary term range of sentence as well as the expanded maximum

term range, and a remand is necessary. On the supplemental issue regarding the impact of the Erlinger decision on defendant's extended term sentence, the State also agrees that defendant is entitled to be resentenced.

In Erlinger, the United States Supreme Court held that "[t]he Fifth and Sixth Amendments require a unanimous jury" and not a judge, to decide whether a defendant's prior convictions used to establish the basis for enhanced sentencing have been proven beyond a reasonable doubt. Id. at 825.

On December 19, 2024, we issued our decision in Carlton, addressing the retroactive application of the Supreme Court's decision in Erlinger, to pipeline cases, such as the present matter. 480 N.J. Super. at 311. We held that a defendant "is entitled to have a jury decide his eligibility for a persistent offender extended term of imprisonment." Id. at 355.

We provided instructions for how the proceedings on remand should be conducted. If, on remand, the State "elect[s] to forego pursuing an extended term," then defendant shall be resentenced within the ordinary range for the crimes for which he was found guilty, namely, reckless manslaughter and aggravated assault. Ibid.

If, on the other hand, the State elects to request the "imposition of the persistent-offender extended term and there is no post-conviction agreement"

between the State and defendant, "the trial judge shall convene a jury for trial limited to the question of whether defendant meets the definition of a persistent offender set forth in N.J.S.A. 2C:44-3(a)". Id. at 356. At the sentencing trial, the State has

> the burden of proving beyond a reasonable doubt all facts and circumstances needed to establish extended-term eligibility under N.J.S.A. 2C:44-3(a), including not only that the prior convictions were entered on separate occasions and the prior crimes were committed at different times, but also that defendant was [twenty-one] years of age or older when the present crime was committed, that defendant was at least eighteen years of age when the prior crimes were committed, and that the latest of the prior convictions or the date of defendant's last release from confinement, whichever is later, is within ten years of the date of the crime for which defendant is being sentenced.
>
> [Ibid.]

Applying our holding and instructions to defendant's case, the State agrees that defendant's extended term sentence should be vacated, and his case should be remanded to the trial court for further proceedings consistent with our opinion in Carlton. Thus, we need not further analyze the case or defendant's contentions. Defendant is entitled to be resentenced.

## III.

We, therefore, affirm defendant's convictions but vacate his sentence and remand for resentencing in accordance with <u>Carlton</u>.

Affirmed in part, vacated and remanded for resentencing. We do not retain jurisdiction.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

*M.C. Harley*

Clerk of the Appellate Division

A-2454-22